[No. 52773-3.   En Banc.   March 3, 1988.]

STEPHEN DETWEILER, ET AL, *Respondents,* v. J. C. PENNEY CASUALTY INSURANCE COMPANY, *Appellant.*

*Thompson, Krilich & La Porte, P.S.*, by *Joseph G. Tucci, Jr.*, for appellant.

*William H. Sumerfield* and *John J. Dorman* (of *Dorman, Meyers & McMenamin*), for respondents.

ANDERSEN, J.—

## FACTS OF CASE

This case involves a claim made under the uninsured motorist (UM) coverage of an automobile insurance policy. The facts concerning the claimant's injury are unusual, as were the procedures whereby the claimant obtained a money judgment against the insurer, J. C. Penney Casualty

Insurance Company. Although the UM endorsement required arbitration of damages and liability issues, the trial court entered a summary judgment for damages against the insurer in the declaratory judgment action brought by the claimant to determine disputed coverage issues. We reverse the summary judgment against the insurer and remand for trial on a factual issue relating to coverage.

The litigation in this case arose out of the following facts. The claimant, Stephen Detweiler, who had been drinking beer with another man in a tavern, adjourned to the claimant's home where they drank some more beer and then some whiskey. As they prepared to leave, the other man drove off in the claimant's pickup truck. The claimant leaped onto the bed of the departing pickup, grabbed hold of the roll bar and was taken on a wild night ride through city streets and back roads. Eventually, the pickup abruptly decelerated and the claimant fell or was thrown off. The driver of the pickup then turned and drove past the claimant who by then was on the roadway and had drawn the loaded .357 Magnum pistol he was carrying. The claimant, from his position on the roadway, fired six bullets from a point–blank range (as close as approximately 10 to 12 feet) at the steel left rear wheel and tire of the passing pickup in an effort to stop it. The bullets fragmented when they hit the steel wheel, axle and frame, and the claimant's face and neck were spattered with metal fragments which caused him neck, facial and eye injuries.

The claimant brought this declaratory judgment action against the insurance carrier for his pickup truck, J. C. Penney Casualty Insurance Company, seeking a declaration that he had the right to recover for his injuries under the insurance policy on his own pickup truck. It is the claimant's theory that he is covered for this occurrence by the UM endorsement on the policy as well as the personal injury protection (PIP) endorsement on the policy. The claimant also filed a separate personal injury action against the uninsured driver.

For purposes of convenience, we will herein refer only to the UM coverage. The driver had no insurance, therefore, the underinsured motorist (UIM) coverage is not involved. Our holding on the UM coverage issue in this case also pertains to the PIP coverage of the policy.

The claimant and insurer each separately moved for summary judgment on the coverage issue. The trial court denied the insurer's motion for summary judgment. Then, just before the date set for trial of the claimant's declaratory judgment action, it granted the claimant's motion for summary judgment. The insurer appealed and we granted direct review.

Four issues are presented.

### ISSUES

ISSUE ONE. Were the claimant's injuries caused by "accident" as required by the UM coverage clause?

ISSUE TWO. Did the pickup driver's liability for the claimant's damages arise out of the "ownership, maintenance, or use" of the uninsured motor vehicle as required by the UM coverage clause?

ISSUE THREE. Does the insurance policy's coverage limitation for vehicles owned by or furnished for the regular use of any named insured or any family member exclude claimant's UM claim?

ISSUE FOUR. Did the trial court err when, in the declaratory judgment action: (1) it considered the findings of fact that had been entered in claimant's personal injury action against the uninsured pickup driver; (2) held that those findings were determinative of liability and damages; and (3) entered a money judgment in the claimant's favor against the insurer?

### DECISION

ISSUE ONE.

CONCLUSION. Under the somewhat bizarre facts of this case, we conclude that there was a factual issue as to whether or not the claimant's injuries were caused by "accident" within the contemplation of the uninsured

motorists' coverage on the claimant's pickup truck. The summary judgment for the claimant on the coverage issue must, therefore, be reversed and the cause remanded for trial of that issue.

Uninsured motorist insurance policies and endorsements usually state who is entitled to seek indemnification either by defining the term "insured" or by specifying the meaning to be accorded the term "covered person" in the policy.[1] The UM coverage clause in the automobile insurance policy on the pickup truck reads as follows:

> We will pay damages which a covered person is legally entitled to recover from the owner or operator of an uninsured motor vehicle because of bodily injury sustained by a covered person and *caused by an accident*. The owner's or operator's liability for these damages must arise out of the *ownership, maintenance or use* of the uninsured motor vehicle.

(Emphasis in policy deleted; our italics added.)

Applying the facts of this case to the language of the foregoing coverage clause, we observe that the claimant owned the pickup, bought the insurance policy on it, and was the named insured on the policy declarations. Accordingly, the claimant is a "covered person". In the separate personal injury action brought by the claimant against the pickup driver, the claimant was held to be legally entitled to recover damages from the driver. In the declaratory judgment action brought by the claimant against the insurer, it was uncontroverted that the driver had taken the pickup without permission and had no liability insurance coverage under the policy on the pickup.[2] Thus, under the policy's UM endorsement, the pickup was an uninsured motor vehicle.

The insurer raises three primary coverage issues on appeal, others of which we deal with under Issues Two and

---

[1] 1 A. Widiss, *Uninsured and Underinsured Motorist Coverage* § 4.1, at 54 (1985).

[2] See Liability Coverage Exclusion 11.

Three herein; it raised them unsuccessfully in the trial court.

The insurer first argues that whether the claimant's injuries were "caused by an accident", as required by the UM coverage clause, is at least a question of fact and one it was entitled to have tried to a jury. Under the facts presented, we agree.

Where, as here, the word "accident" is not otherwise defined in a policy,[3] we look to our common law for definition. As summarized by Judge McInturff writing for the Court of Appeals in *Unigard Mut. Ins. Co. v. Spokane Sch. Dist. 81*, 20 Wn. App. 261, 263–64, 579 P.2d 1015 (1978),

> In a long line of cases our courts have said that an accident is never present when a deliberate act is performed unless some additional unexpected, independent and unforeseen happening occurs which produces or brings about the result of injury or death. The means as well as the result must be unforeseen, involuntary, unexpected and unusual.

(Footnotes omitted.)[4]

Based on this principle, coverage has been denied as a matter of law when what occurred was clearly not an "accident".

In *Unigard*, it was held that the intentional and deliberate act of an 11–year–old boy in starting a fire that caused $250,000 damage to a school building was not an "accident" despite the boy's protestations that he neither intended nor expected the fire to damage the school.

---

[3]*See, e.g.*, WAC 284–50–315(4), wherein the Insurance Commissioner has promulgated a rule which prohibits issuance of disability insurance policies that require "accidental means" as a test or condition of coverage.

[4]*Accord, Johnson v. Business Men's Assur. Co. of Am.*, 38 Wn.2d 245, 249, 228 P.2d 760 (1951); *Pierce v. Pacific Mut. Life Ins. Co.*, 7 Wn.2d 151, 162, 109 P.2d 322 (1941); *Briscoe v. Travelers Indem. Co.*, 18 Wn. App. 662, 666, 571 P.2d 226 (1977); *Safeco Ins. Co. of Am. v. Dotts*, 38 Wn. App. 382, 385, 685 P.2d 632 (1984); *Grange Ins. Ass'n v. Authier*, 45 Wn. App. 383, 385, 725 P.2d 642 (1986), *review denied*, 107 Wn.2d 1024 (1987); *Western Nat'l Assur. Co. v. Hecker*, 43 Wn. App. 816, 822, 719 P.2d 954 (1986). *Cf. Zinn v. Equitable Life Ins. Co.*, 6 Wn.2d 379, 392, 107 P.2d 921 (1940).

In a case where death was caused by a fatal backhanded blow administered by one person to another, the fatality was found not to be an "accident" even though the one who delivered the blow said that he intended no harm.[5]

Similarly, the taking of indecent liberties with a young girl was held not to be an "accident" even though the child molester said he intended no harm and an expert witness opined that "sexual molesters or offenders such as [the molester] rarely intend to harm their victims."[6]

In yet another case it was held that "[w]here the minor insured allegedly viciously assaulted and beat another youngster, we cannot conclude that the means was accidental."[7]

And where the insured's act of anal sexual intercourse with another was deliberate, it was held not to have been an accidental injury under the insured's homeowners policy.[8]

There are many definitions of the word "accident". Judging from the plethora of law on the subject,[9] no one of them seems to be perfectly satisfactory to everyone. The definition of "accident" applied in the cases just discussed is founded on the elemental proposition that injuries will not be deemed caused by accident where the injuries are intentionally inflicted, this generally being considered a risk which it would be against public policy to insure.[10] Thus, for example, the law will not countenance one intentionally

---

[5] *Dotts,* at 385–86.

[6] *Authier,* at 385–86.

[7] *Briscoe,* at 666.

[8] *Hecker,* at 822–23.

[9] *See* 1A J. Appleman, *Insurance* §§ 360–366 (rev. ed. 1981); 7 J. Appleman, *Insurance* §§ 4311–4324 (1962); 12 G. Couch, *Insurance* §§ 45:34–45:41 (2d ed. 1981).

[10] 7 J. Appleman, *Insurance* § 4312, at 129 (1962); *Unigard Mut. Ins. Co. v. Spokane Sch. Dist. 81,* 20 Wn. App. 261, 265, 579 P.2d 1015 (1978); *Dotts,* at 386.

shooting someone and then saying that since he or she did not intend to hurt the person shot, what happened was an "accident" covered by liability insurance.

In one case that cited the *Unigard* means/result definition of "accident" described earlier, the coverage question was held to require a factual determination necessitating a trial in order to decide whether what occurred was an "accident" or not. That case involved a person who could swim fairly well. He was seen running in and out of traffic on the roadway near the west end of the Evergreen Point Floating Bridge, before he leaped into the water and drowned. It was held that under the circumstances there was a factual issue as to whether the death was caused by accidental bodily injury. After reviewing the facts, the court concluded that a jury could reasonably infer that "he intended merely to leap to a point of relative safety not realizing the magnitude of his peril caused by a combination of the height of the bridge above the lake and the relatively shallow depth of the water."[11]

As with that case, the case before us is also factually unusual. According to the claimant's deposition in the declaratory judgment action, he intentionally fired six bullets from a range as close as 10 to 12 feet at the steel left rear wheel and tire of his pickup truck in order to stop it. Five of the six bullets hit the target dead on, two hitting the metal axle hub where it came through the wheel, three more hitting the steel wheel and one hitting the adjacent steel frame. The bullets arguably did precisely what bullets fired at a high velocity do when they hit steel. They shattered into fragments and spattered metal about the target vicinity, including the side of the claimant's head and neck which were turned toward the wheel. The claimant described his shooting in answers given at his deposition:[12]

---

[11]*McKinnon v. Republic Nat'l Life Ins. Co.*, 25 Wn. App. 854, 860, 610 P.2d 944 (1980).

[12]Deposition of Stephen Detweiler, at 27–28.

Q Since the time of this accident, have you been told what actually caused the injury to your eye?

A Lead fragments or—lead and steel fragments.

Q Have you been told where those fragments came from, or do you know?

A Well, it's obvious the lead and the copper would have come off my round off my—from my weapon, and there was some traces of steel, which would have been the axle, I'm sure. Two rounds hit that dead center in the axle, three hit the wheel, one went through the frame, the spare tire.

Q Is that from your observations later on?

A Yes, sir.

Q Were any of those discharges of your handgun accidental?

A No, sir.

Q Were you aiming the handgun on each discharge?

A Yes, sir.

Q Do you recall after which round that you felt the sensation of being hit?

A No, sir, because I was in the process of getting out of the way of that truck coming right at me again, and when it happened I was still—I still fired, so it would have been near the—I couldn't exactly say. It could have been four, five or number six.

Q The first shot that you had fired, you were aiming at the pickup truck?

A At the left rear wheel, tire.

This is not a case where the claimant was unfamiliar with firearms and bullets. He testified at his deposition that he served in the army for 2 years during which time he was a helicopter door gunner and was trained in the use of machine guns and M–16 rifles. He had also taken a hunting education course three times and often carried on his person, and practiced with, the .357 Magnum handgun in question. He had fired over 100 rounds from the gun.

Nor is it a case of a shooter unfamiliar with his target. He owned the 1977 Chevrolet Silverado 4–wheel drive "short box" pickup truck, and in addition to driving it to work used it for hunting; he undoubtedly knew that the wheel he shot at and the adjoining frame of the vehicle

were constructed of steel. In addition, he was a truck driver and a stock car racing driver.

Furthermore, it is at least arguable that the repeated firings by which the claimant emptied his gun at his pickup virtually assured that he would be hit by at least some of the bullet fragments. He was, for example, unable to tell whether fragments from the fourth, fifth or sixth rounds struck him.

Although the result of claimant's action (being struck by metal fragments in the neck, face and eye and sustaining injuries therefrom) was doubtless unintended, the means (shooting bullets from a gun at a nearby steel target) were obviously intended. It is thus arguable that claimant's injuries were a natural consequence of his actions and that no "additional unexpected, independent and unforeseen happening"[13] occurred to bring them about. A motion for summary judgment, however, "should be granted only if, from all the evidence, reasonable [persons] could reach but one conclusion."[14] Under the facts presented, the rapidly moving pickup truck and moving shooter resulted in changing distances between shooter and pickup. Those and other variables inherent in this confused occurrence, such as angle of fire, make "accident" a factual issue since reasonable minds could disagree as to whether under the circumstances what happened was an additional, unexpected, independent and unforeseen happening which brought about the injuries.

There was, therefore, a factual issue as to whether what occurred here was an "accident" for which the automobile insurance policy provided UM coverage. The trial court erred in determining this issue as a matter of law and in

---

[13]*Unigard Mut. Ins. Co. v. Spokane Sch. Dist. 81,* 20 Wn. App. 261, 264, 579 P.2d 1015 (1978).

[14]*Barrie v. Hosts of Am., Inc.,* 94 Wn.2d 640, 642, 618 P.2d 96 (1980). *Accord, Padron v. Goodyear Tire & Rubber Co.,* 34 Wn. App. 473, 475, 662 P.2d 67, *review denied,* 100 Wn.2d 1003 (1983).

granting the claimant's motion for summary judgment on the coverage issue.[15]

■ Claimant also argues that the insurance policy requirement of bodily injury caused by "accident" is void as against public policy as evinced by the present uninsured/underinsured (UM/UIM) statute. That is incorrect; the statute refers to its applicability to "accidents".[16]

ISSUE TWO.

CONCLUSION. Where the UM claimant tried to stop the driver from taking his pickup truck by shooting at it, and bullets hitting the pickup fragmented and struck the claimant causing injury and damages, the driver's liability for such damages arose out of the driver's "use" of the pickup within the contemplation of the UM coverage clause.

■ In this second issue related to coverage, the insurer argues that the damages for bodily injury sustained by the claimant did not arise out of the "ownership, maintenance or use" of the uninsured vehicle as required by the UM coverage clause. We need only respond to one of these three alternatives. In order for an accident and liability therefor to arise out of the "use" of an uninsured motor vehicle, it is not necessary that the use be the proximate cause of the occurrence or of the injuries sustained therein; it is only necessary that there be a causal connection between them.[17] Here, the pickup causally contributed to the claimant's injuries when the bullets struck the pickup, which was being driven off, then fragmented and injured him.[18]

---

[15]CR 56(c); *see Barrie; Padron.*

[16]RCW 48.22.030(1), .040(2). *See* 12A G. Couch, *Insurance* § 45:620, at 17 (rev. ed. 1981).

[17]*Transamerica Ins. Group v. United Pac. Ins. Co.,* 92 Wn.2d 21, 26, 593 P.2d 156 (1979).

[18]*See Transamerica,* at 26–28; *Laviana v. Shelby Mut. Ins. Co.,* 224 F. Supp. 563, 565 (D. Vt. 1963). *See also* 1 A. Widiss § 11.4, at 374.

ISSUE THREE.

CONCLUSION. Since the claimant was neither operating nor occupying the pickup at the time he was injured, the modified household exclusion clause relating to the policy's UM coverage is not applicable.

An exclusion in claimant's policy applicable to the UM coverage provides that the policy's definition of an uninsured motor vehicle does *not* include any vehicle

[o]wned by or furnished or available for the regular use of you or any family member *unless the covered person was neither operating nor occupying such vehicle at the time of the accident.*

(Italics ours.)[19]

Under the facts of this case, it is unnecessary to examine the public policy aspects of clauses of this type.[20] Here, the claimant was on the street shooting at the passing pickup truck at the time of his injury, thus he comes within the exception to the exclusionary clause, namely, "unless the covered person was neither operating nor occupying such vehicle at the time of the accident". The claimant was not operating or occupying the vehicle at the time he was injured, therefore, this exclusion does not bar coverage.

ISSUE FOUR.

CONCLUSION. Under the terms of the arbitration clause applicable to UM coverage, the insurer was entitled to have liability and damages determined by arbitration, however, it waived that right by its conduct. Accordingly, the trial court did not err when it considered those issues as having been determined by the findings entered in claimant's earlier personal injury action against the uninsured driver.

---

[19]This clause is here set out in the form in which it appears in Brief of Appellant, at 14 and Brief of Respondent, at 48. Since the appellate record is conflicting as to exactly what the language of this clause is, we have used that form which both appellate briefs state it to be.

[20]*See* 1 A. Widiss, *Uninsured and Underinsured Motorist Coverage* § 8.6 (1985); *cf.* RCW 48.22.030(2) and *Millers Cas. Ins. Co. v. Briggs,* 100 Wn.2d 1, 665 P.2d 891 (1983).

The insurer claims it was denied its contractual right to arbitrate liability and damages issues when the trial court concluded that those issues had been decided in the earlier personal injury action between claimant and the uninsured driver. Claimant cites the Court of Appeals decision in *Finney v. Farmers Ins. Co.,* 21 Wn. App. 601, 586 P.2d 519 (1978), for the proposition that the insurer had a duty to intervene in that action and, since it knew of the action but did not intervene, it is bound by the findings. He also argues that this court inferentially approved that holding when it affirmed *Finney,* even though that particular issue was not reviewed.[21] The insurer questions this, and also argues that unlike the insurer in *Finney* it does not concede it had the right to intervene. As counsel for the insurer stated in an affidavit, he believed his client had no such right and that to have intervened would have engendered a conflict of interest. While there are obviously many unresolved procedural issues relating to collateral estoppel and intervention, particularly since the adoption in this state of the new uninsured/underinsured motorists statute,[22] they must await another day and another case. It is unnecessary to reach those issues in this case, therefore, we do not do so.

■ The insurer did have the right to arbitrate the liability and damage issues. Implicit in the trial court's ruling in the declaratory judgment action, however, is the conclusion that the insurer waived that right. We agree. "It is well established that an arbitration clause can be waived."[23] The injury occurred on December 11, 1981, claims were promptly made, and the insurer almost immediately denied coverage for the claims at issue. In the over 4 years that went by before judgment was entered against it, the insurer

---

[21]*See Finney v. Farmers Ins. Co.,* 92 Wn.2d 748, 750, 600 P.2d 1272 (1979).

[22]*See* Barns & Smith, *Washington's Underinsured Motorist Statute: Examining the Procedural Issues,* 17 Gonz. L. Rev. 269 (1982).

[23]*Finney v. Farmers Ins. Co.,* 21 Wn. App. 601, 620, 586 P.2d 519 (1978), *aff'd on other grounds,* 92 Wn.2d 748, 600 P.2d 1272 (1979).

never demanded arbitration or even declared that once coverage was resolved it would insist upon arbitration. In October 1982, the claimant commenced his personal injury action against the uninsured driver. He notified the insurer of this action and filed a separate declaratory judgment action against the insurer in December 1983. In the more than 1 year that elapsed between notice to the insurer and the time that the personal injury action against the driver went to trial, the insurer made no attempt whatsoever to resolve the coverage dispute by noting the declaratory judgment action for trial, by seeking a speedy trial thereof as it had every right to do,[24] or otherwise. In addition to the insurer being promptly notified of the filing of the personal injury action, it was also kept informed of its progress and of the trial date. Under these circumstances, the insurer waived its contractual right to arbitrate the liability and damage issues.

Furthermore, the record suggests that the insurer had probably long since concluded that the value of claimant's injury claim (which included the blinding of one eye of a young, employed man with a family) was at least equal to the UM policy limits ($50,000) and the PIP endorsement limits ($10,000), the amount for which the trial court entered judgment against the insurer.

It would perhaps be helpful to observe that at least the broad outline of uninsured/underinsured motorists procedures is now well settled in this state. Unlike the more cumbersome and time consuming procedures that exist in many other jurisdictions, such cases may ordinarily be handled much more expeditiously than the usual court trial. In fact, a primary object of arbitration proceedings is to avoid the delays of ordinary litigation.[25] Where there is an arbitration clause in an insurance policy which requires that

---

[24]CR 57.

[25]*Thorgaard Plumbing & Heating Co. v. County of King*, 71 Wn.2d 126, 132, 426 P.2d 828 (1967); *Keen v. IFG Leasing Co.*, 28 Wn. App. 167, 172, 622 P.2d 861 (1980).

liability and damages issues be arbitrated, public policy favors such arbitrations.[26]

The question of coverage, however, is for the courts to determine.[27] If a party refuses to arbitrate, the court can compel the reluctant party to do so.[28] If there is cause to question the existence or validity of the arbitration agreement, as for example where there is a coverage issue,[29] the court may stay the arbitration and order an expedited trial.[30] If there is a factual issue, a jury may also be demanded for such trial, if desired.[31] If a party wants to have a coverage issue resolved, such an adjudication may be obtained through a declaratory judgment action.[32] And if desired, a jury trial may also be obtained to try any factual issues in the declaratory judgment action.[33]

Since an expedited trial date may similarly be requested by any party to a declaratory judgment action,[34] there should ordinarily be no reason why the arbitration of the liability, injuries and damages issues need be unreasonably

---

[26]*Zindorf Constr. Co. v. Western Am. Co.*, 27 Wash. 31, 38, 67 P. 374 (1901); *Christie–Lambert Van & Storage Co. v. McLeod*, 39 Wn. App. 298, 303, 693 P.2d 161 (1984); *see also Harvey Aluminum (Inc.) v. United Steelworkers*, 263 F. Supp. 488, 495 (C.D. Cal. 1967).

[27]RCW 7.04.010; *see Hartford Accident & Indem. Co. v. Novak*, 83 Wn.2d 576, 586, 520 P.2d 1368 (1974); *Rau v. Liberty Mut. Ins. Co.*, 21 Wn. App. 326, 335, 585 P.2d 157 (1978); *Cantwell v. Safeco Ins. Co.*, 37 Wn. App. 133, 136, 678 P.2d 852 (1984).

[28]RCW 7.04.040(1).

[29]*See Cantwell*, at 136–37.

[30]RCW 7.04.040(2).

[31]RCW 7.04.040(3).

[32]RCW 7.24.

[33]CR 57.

[34]CR 57.

delayed by the pendency of such action, providing that at least one of the parties thereto is diligent in pursuing it.

We conclude in this case that the trial court did not err in denying the insurer's request to arbitrate the liability and damages issues. Because of our holding that a factual issue remains regarding coverage, however, we reverse the money judgment against the insurer and the summary judgment order in favor of claimant on coverage and remand the case to the trial court for trial of the disputed factual issue.

PEARSON, C.J., and UTTER, BRACHTENBACH, DOLLIVER, DORE, CALLOW, GOODLOE, and DURHAM, JJ., concur.